[Civ. No. 20143.   Second Dist., Div. Two.   Nov. 29, 1954.]

RICHARD GRANVILL TALBERT, Appellant, v.
A. G. OSTERGAARD, Respondent.

Elmer Low and Winston R. Cornell for Appellant.

Sampson & Dryden, R. S. Harrington and Jacob Swartz for Respondent.

FOX, J.—Plaintiff appeals from an adverse judgment in an action to recover for personal injuries.

Plaintiff was injured during the course of his employment as a painter. He was the foreman in charge of painting the exterior of the Lankershim Hotel in Los Angeles. His injuries occurred when one side of an electrical swing stage upon which he had been working, gave way and precipitated him 50 feet to a safeway scaffold below.

The electrical swing stage had been rented by defendant to plaintiff's employer 23 days before the accident, and had been in use by plaintiff during most of that period. Defendant testified that this stage was inspected after each rental and all necessary repairs made. On October 3, 1951, plaintiff noticed that on one or two occasions the stage dropped between one and three inches with a "clicking noise" while in operation. He conceded that while working on other stages he had also experienced the sensation of a slight dropping of the stage, which often occurs as the result of the settling of

the hooks in the firewall or the slipping into place of a wound cable which had been piled up on one area of the drum during the rotating process. However, he stated the slipping, accompanied by the clicking sound, was of a character he had not previously experienced, so he telephoned defendant to apprise him of that fact. Defendant dispatched one of his employees, Mack Sterling, to inspect the equipment. Subsequent to the inspection, plaintiff telephoned defendant to inquire about the results of the inspection and was informed the stage was in good mechanical condition. Thereafter, plaintiff detected no mechanical difficulty and continued to use the stage until October 6, 1951, at which time the accident occurred.

It becomes necessary at this point to furnish a description of the apparatus here involved. An electrical swing stage is used on jobs entailing external work on vertical walls. It basically resembles the ordinary painter's scaffold except that it is power-operated. The principal operating mechanism is located under a floorboard in approximately the center of the platform or stage upon which the painters stand while working. This operating unit includes two drums separately mounted on parallel shafts. The drums are rotated by an electrical motor which activates a pinion gear which in turn engages with large meshed gears mounted on the shafts at one side of the drums. The steel cables are wound around the drums and from there run laterally underneath the floor to the ends of the stage, where they go into the groove of a pulley wheel and then proceed upward along opposite extremities of the stage. Each cable terminates in a hook which is fastened over the uppermost edge or firewall of a building.

As has been stated, the cable drums, which are mounted on shafts, are situated close enough to each other to permit a large gear located at one end of each drum to mesh. In order to keep the gears of the respective drums in mesh, a small steel latch has been provided which fits over the shaft of each drum. It is located between the drum and the framework on which the shaft is mounted, and is termed a "spreader," its function being to prevent the drums from moving laterally or axially along the shaft, since such a movement would disengage the drum gears. The effect of such a disengagement on the drum would be to make it "free-wheeling" and cause the release of the wound cables, thus allowing the stage to drop. The latch is designed in the form of a horizontal bar with one hooked, semicircular end which fits over the rounded shaft. A small safety pin fits

over the latch to safeguard against the latch's moving upward from its normal position. When the latch is properly emplaced, there is no possibility of a lateral play or displacement by a drum sufficient to disengage its gears from those of the other drum. When the safety pin is in its proper place, the latch cannot be lifted and moved out of place manually.

Plaintiff testified that when the edge or firewall of a building from which the stage is suspended is not level, or is of unequal height, he ordinarly makes an adjustment of the cables to compensate for the uneven firewall, in the event the differential is about one foot or more. When such an adjustment is called for, the procedure includes removal of the safety pin, elevation of the latch, and a lateral movement of one drum in order to disengage the mesh gears and permit manipulation of the cable to the extent necessary to level the stage. Plaintiff denied that he made any adjustment, stating "the building's firewalls were perfectly flat and didn't require any adjustment of the mechanism." Defendant introduced a photograph of the site where plaintiff had been painting when the stage fell which revealed a difference in the height of the firewall. An expert witness testified he measured this differential and found it to be 9½ inches. Plaintiff testified that he had inspected the firewall during the trial and asserted that recent work on the roof accounted for the offset in height, which he claimed was not present at the time of the accident.

Both plaintiff and his stepfather, Mr. Hamlin, each of whom inspected the stage at the scene after the accident, testified that the safety pin was in after the accident. Hamlin stated the latch was bent upwards out of position and was slightly twisted; that the safety pin "did not extend clear across the top of it, it stuck out only over one edge." He testified the stage was warped and described the pinion gears as very loose and wobbly, and the driving gears as worn.

Defendant, concededly a nonexpert, inspected the stage a short time after the accident. His examination showed that one of the latches was out of place and that one of the drums had become completely disengaged from the other. He noticed no warping of the stage. His observation of the gears disclosed some movement therein, but no more than is present even in brand new gears. He denied that the latch was bent or twisted. Defendant testified he could not recall whether the safety pin was in place after the accident. He

testified that with the safety pin in place over the latch, "I could find no explanation or think of any way it (the latch) could possibly get out of there. I have taken a crowbar and tried to pry it out of there."

Mr. Shields, defendant's expert witness, testified that the latch is designed to have a twist of 90 degrees in order to accomplish its normal mechanical function. Shields also stated there is nothing in the normal operation of the working parts of the stage which exerts any force or upward pressure on the latch. He likewise stated that if the safety pin is in position it is impossible to move the latch by hand.

Plaintiff's expert, Dr. Morelli, assistant professor of mechanical engineering at the California Institute of Technology, testified hypothetically, having no practical experience with a stage such as is here involved. He ascribed the noises and the dropping of the stage, of which plaintiff had complained, to the fact that the teeth of the gears were slipping past each other. He attributed this to the possibility of worn bearings, which would throw the gears out of mesh. He stated that worn bearings could have been observed by a reasonable inspection. In his opinion, the presence of either worn bearings or wobbly gears would cause the gears to become disengaged, and by axial pressure, force the lever up and back over the safety pin, thus permitting the drum to ride free and the staging to fall.

Plaintiff took the deposition of Mack Sterling, defendant's employee who had been sent to inspect the stage in response to plaintiff's complaint. This deposition had never been signed by Sterling. In his opening statement to the jury, defense counsel referred to the fact that Sterling had been sent to inspect the stage complained of and found nothing wrong with it. When it became apparent, near the close of the trial, that defendant would not produce Sterling as a witness to disclose what his inspection revealed, plaintiff offered the deposition in evidence at a conference with the judge outside the jury's hearing. Upon objection by defendant on the ground that the deposition was unsigned, the court denied its admission.* During the colloquy at the bench, defendant's counsel stated he had never intended to call Sterling as a witness "for various reasons, including the fact that I don't believe that he is mentally competent." Plaintiff endeavored to bring Sterling into court under sub-

---

*Plaintiff's counsel unsuccessfully urged to the trial judge that it had been his understanding that the signing of the deposition had been waived.

poena, but his process server could not locate him during the trial. It was established that although Sterling was no longer in defendant's employ at the time of the trial, Sterling maintained a shop on defendant's premises, and had been seen there by defendant during the progress of the trial. Defendant stated he did not ask him to come to court because he had no reason to make such a request. After all the evidence was heard, defendant's counsel asked for, and obtained, a stipulation in open court that Sterling's deposition was taken, but was not signed.

Following the jury's verdict, the court denied plaintiff's motion for a new trial. This appeal followed.

The case was tried, and the jury instructed, on the theory of res ipsa loquitur. Defendant does not here dispute that plaintiff was entitled to the benefit of that doctrine. This is evidently premised on defendant's recognition of the applicability of the doctrine where the circumstances suggest as an apparent cause of the accident negligence in the inspection or maintenance of the stage for which defendant would be responsible. (See *Rose* v. *Melody Lane,* 39 Cal.2d 481, 487 [247 P.2d 335]; *Rafter* v. *Dubrock's Riding Academy,* 75 Cal.App.2d 621, 626, 627 [171 P.2d 459]; Prosser, *Res Ipsa Loquitur in California,* 37 Cal.L.Rev. 183, 200-201.) The continued mechanical efficiency of the operating mechanism for normal use on the job for which it was rented, particularly with respect to the condition of gears and bearings, was a specific responsibility undertaken by defendant as part of the rental arrangement. There is no evidence that the stage, or any part thereof, was handled in a manner that deviated significantly from that of ordinary use. The primary question confronting us, therefore, is whether the evidence on defendant's behalf was sufficient to meet or balance the inference of negligence arising from the application of res ipsa loquitur. (*Burr* v. *Sherwin-Williams Co.,* 42 Cal.2d 682, 691 [268 P.2d 1041].)

It is plaintiff's contention that the evidence is insufficient as a matter of law to meet this inference of negligence in view of defendant's failure to place Sterling on the witness stand to disclose what kind of an inspection had been made by Sterling and what that inspection revealed with reference to the condition of the stage when plaintiff complained about it prior to the accident. A review of the record and an examination of the applicable case law convinces us of the merit of plaintiff's position.

228

■ It is now settled law that, while a defendant in a controversy, in which the doctrine of res ipsa loquitur is applicable, is not required to prove himself free from negligence by a preponderance of the evidence, he must shoulder the burden of going forward with the evidence, that is, the burden of producing evidence sufficient to meet the inference of negligence by offsetting or balancing it. (*Williams* v. *City of Long Beach*, 42 Cal.2d 716, 718 [268 P.2d 1061]; *Burr* v. *Sherwin-Williams Co., supra.*) ■ Procedurally, it is incumbent on defendant to rebut the inference by a showing " 'either (1) of a satisfactory explanation of the accident, that is, an affirmative showing of a definite cause for the accident, in which cause no element of negligence on the part of the defendant inheres, or (2) of such care in all possible respects as necessarily to lead to the conclusion that the accident could not have happened from want of care, but must have been due to some unpreventable cause, although the exact cause is unknown. In the latter case, inasmuch as the process of reasoning is one of exclusion, the care shown must be satisfactory in the sense that it covers all causes which due care on the part of the defendant might have prevented.' " (*Dierman* v. *Providence Hospital*, 31 Cal.2d 290, 295 [188 P.2d 12].) ■ In short, the "explanation which the defendant is required to make is an explanation of his conduct and, to be complete, it must be as broad as the inference." (*Hinds* v. *Wheadon*, 67 Cal. App.2d 456, 464 [154 P.2d 720].) ■ The question of the sufficiency of a defendant's explanation of the accident or the sufficiency of his evidence of due care is ordinarily one of fact for the jury. (*Druzanich* v. *Criley*, 19 Cal.2d 439, 444 [122 P.2d 53]; *Ireland* v. *Marsden*, 108 Cal.App. 632 [291 P. 912].) But if, in explaining his conduct, the defendant fails to produce substantial evidence of the use of due care, as where he fails adequately to disclose the nature of an inspection he was required to make, his defense may be held insufficient as a matter of law. (*Chutuk* v. *Southern Calif. Gas Co.*, 218 Cal. 395, 399-400 [23 P.2d 285]; *O'Connor* v. *Mennie*, 169 Cal. 217, 226 [146 P. 674]. See *Dierman* v. *Providence Hospital, supra.*)

■ It is admitted that Sterling was sent out to make an inspection of the stage because of plaintiff's complaints about its erratic behavior prior to the accident and it is not questioned that Sterling was available to defendant as a witness. No person who testified was able to state definitely

in what fashion the accident actually occurred. The record shows that the latch was not in its normal position after the accident, but that the safety pin was in and at least partially over the latch. In his brief on appeal, defendant concedes that the safety pin was in. Defendant's own expert testified that the latch could not be raised by hand even if the safety pin was only partially across the latch. Nevertheless, the latch was found to be out of its customary position and the drums were disengaged. There was also testimony that a defective condition of the stage, namely, worn bearings, might have thrown the drum gears out of mesh and forced the latch upwards. In view of the circumstances preceding and attending the accident, and in the light of the rule requiring defendant to go forward with the evidence, defendant should have made available to the court and jury all the information possible which touched upon the source of the injury, and in this connection should have placed upon the stand the employee whom he charged with inspecting the stage. (See *Chutuk* v. *Southern Calif. Gas Co., supra; Meyer* v. *Tobin,* 214 Cal. 135, 137 [4 P.2d 542] ; *O'Connor* v. *Mennie, supra.*) Instead, as stated by defendant's counsel to the trial judge out of the jury's hearing, the omission to call Sterling was intentional and calculated, although he had told the jury in his opening statement that Sterling found nothing wrong with the stage.

The failure of a defendant to produce evidence explaining a circumstance of importance in the case, if such evidence is available, justifies an inference that such evidence, if given, would redound to his prejudice. (*Bone* v. *Hayes,* 154 Cal. 759, 765 [99 P. 172] ; *Hays* v. *Viscome,* 122 Cal. App.2d 135, 138-139 [264 P.2d 173] ; *Leenders* v. *California Hawaiian etc. Corp.,* 59 Cal.App.2d 752, 758 [139 P.2d 987].) This principle applies with particular force where, as here, the circumstance to be explained arises in relation to defendant's burden of meeting an inference of negligence. (*Dierman* v. *Providence Hospital,* 31 Cal.2d 290, 295 [188 P.2d 12].) In the Dierman case, *supra,* the court remarked on this point: "We are constrained to the conclusion that in a res ipsa loquitur case where, in addition to the prima facie showing of negligence, it is admitted or appears without dispute that the defendant has it in his power to produce substantial evidence material to the issue of negligence but fails to do so, it must be presumed that such evidence, if

produced, would have been adverse to defendant, and under such circumstances the evidence is insufficient to support a verdict for the defendant and plaintiff is entitled to a directed verdict.''

█ In the present case, not only did defendant himself fail to produce Sterling but he objected to having Sterling's deposition introduced under circumstances in which it appeared this would be the only means of getting Sterling's testimony before the jury. There is no question that defendant's objection was technically correct, but its practical effect was, like his own failure to produce Sterling, to continue to withhold vital and material evidence from the jury.

█ Section 1963 of the Code of Civil Procedure, in listing disputable presumptions, in subdivision 5, provides: ''That evidence willfully suppressed would be adverse if produced; . . .'' In *Breidenbach* v. *McCormick Co.*, 20 Cal.App. 184, 189 [128 P. 423], the court, in a res ipsa loquitur situation, asserted that defendant's objection to the introduction of an unsigned deposition of its deceased employee, whose exercise of due care was in issue, justified the inference that its contents would be unfavorable to defendant. So strongly are these principles embedded in our jurisprudence that their implementation is provided for in section 2061 of the Code of Civil Procedure, which provides that juries shall be instructed: ''6. That evidence is to be estimated not only by its own intrinsic weight, but also according to the evidence which it is in the power of one side to produce and of the other to contradict; . . .'' The court omitted to give this pertinent instruction, though the state of the record made it peculiarly applicable. (*Hays* v. *Viscome, supra,* p. 139.)

The rule of these code sections, which is the foundation for the holding in the Dierman case, supra, is predicated on the salutary concept that the objective of a trial is to arrive at the true facts. A trial is not to be perverted into a game which allows a defendant to refrain, with impunity, from producing evidence of a fact which is uniquely within his knowledge, or that of his agent, when the burden of explanation rests with such defendant. In passing on whether defendant has sufficiently met the requirement that he explain his conduct, an appellate court may take cognizance of the principles to which we have alluded. (*Dierman* v. *Providence Hospital, supra,* p. 295.) In *Bone* v. *Hayes, supra,* the court said (pp. 765-766) : '' 'It is a well-settled rule that when the

evidence tends to prove a material fact which imposes a liability on a party, and he has it in his power to produce evidence which from its very nature must overthrow the case made against him if it is not founded on fact, and he refuses to produce such evidence, the presumption arises that the evidence, if produced, would operate to his prejudice, and support the case of his adversary.' [Citations.] . . . It is no doubt true that these are primary rules to guide the jury or the trial court in passing, in the first instance, on the issues of fact. This court is not, on appeal, to make an original finding on any such issue: The conclusions on controverted matters of fact reached in the court below must stand here, unless we can say, as [sic] matter of law, that they are without substantial support in the evidence. But, in reading the evidence with a view to ascertaining its sufficiency, this court, like the trial court, must necessarily be guided by the means furnished by the law for measuring the effect of the production or withholding of certain evidence.''

In the case at bar, it was of crucial importance to clarify whether the displacement of the latch and the disengagement of the drums were caused by any defective condition in the stage, for the inspection and maintenance of which defendant had assumed responsibility. Such an inspection had in fact been made a short time before the accident and the inspector was available to tell what he did and what he found. This would have given the jury an opportunity to judge Sterling's qualification to make such an inspection and to decide whether he had used due care in ascertaining whether any defect existed in the appliance supplied by defendant. Yet defendant, having it in his power to show that he had used due care, or that the accident occurred with ''no element of negligence on his part,'' chose not to produce this significant witness. It is thus apparent that, giving due effect to the rules of law hereinabove discussed, the verdict for the defendant cannot be sustained. (*Dierman* v. *Providence Hospital, supra,* p. 296; *Druzanich* v. *Criley,* 19 Cal.2d 439, 444 [122 P.2d 53]; *Chutuk* v. *Southern Calif. Gas Co.,* 218 Cal. 395, 399-400 [23 P.2d 285].)

The case cited by defendant, *Ward* v. *Silveria,* 102 Cal. App.2d 114 [226 P.2d 732], is distinguishable in that the critical testimony here omitted was there produced. At page 119, the court points out that ''respondents produced testimony as to their care in the inspection and testing of the

equipment before and after installation," a factor which is so conspicuously absent in the record before us.

The judgment is reversed.

Moore, P. J., concurred.

McComb, J., dissented.

A petition for a rehearing was denied December 16, 1954, and respondent's petition for a hearing by the Supreme Court was denied January 28, 1955. Edmonds, J., Schauer, J., and Spence, J., were of the opinion that the petition should be granted.